UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:03-CV-519-H

UNITED STATES OF AMERICA,
ex rel. JUAN VILLAFANE, et al.                                    PLAINTIFFS


V.


ROBERT E. SOLINGER, et al.                                       DEFENDANTS


**MEMORANDUM OPINION**

Plaintiffs Juan Villafane and Children's Heart Specialists, P.S.C. have brought this action

against Defendants Robert Solinger, Allan Rees, Francisco Elbl, Larry Cook, Pediatric

Cardiology Associates, P.S.C., Neonatal Associates, P.S.C., Norton Hospitals, Inc. d/b/a Kosair

Children's Hospital, the University of Louisville Medical School Fund, Inc., and the University

of Louisville Research Foundation, Inc.[1]  In Count I of their Complaint, Plaintiffs assert a *qui*

*tam* action under the False Claims Act, 31 U.S.C. § 3729 (the "FCA"), alleging that Defendants

were responsible for the submission of Medicaid reimbursement claims that falsely certified

Defendants' compliance with applicable laws and regulations, namely the so-called Stark law, 42

U.S.C. § 1395nn.

Some time ago, the parties and the Court discussed Defendants' contention that they

---

[1] Plaintiffs filed their thirty-two count complaint in August 2003.  In June 2005 the United States declined to intervene in the matter, pursuant to 31 U.S.C. 3730(b)(4)(B).  Throughout much of 2006 the parties briefed and argued various motions, which the Court addressed in its October 12 and 24, 2006 memorandum opinions and orders.  *Solinger*, 457 F. Supp. 2d 743.  In those orders, the Court dismissed Counts II through XIX, XXIII, XXV, XXXI and all antitrust claims as to all Defendants.  The Court also dismissed Plaintiffs' False Claims Act claim and all state law claims brought against the Medical School Fund and the Research Foundation.

qualify for the Academic Medical Center ("AMC") exception to the Stark law and are therefore entitled to summary judgment on Plaintiffs' FCA allegation.  The AMC exception to the Stark law is a complex and little discussed doctrine.  To resolve this issue early in the litigation, the Court provided an opportunity for full discovery of the relevant evidence.  The Court has now thoroughly acquainted itself with the AMC exception by conducting a lengthy hearing and by looking at the issues from every perspective.  The Court has become convinced that Defendants meet both its particular criteria and its broader purpose.  This memorandum discusses the Court's reasons for reaching this conclusion.

## I.

One can find a full summary of the facts of this case in a previous opinion, *U.S. ex rel. Villafane v. Solinger*, 457 F. Supp. 2d 743, 747–49 (W.D. Ky. 2006), making only a brief recapitulation necessary here.

Plaintiff Juan Villafane is a pediatric cardiologist and former University of Louisville Medical School professor who was also formerly a member of Pediatric Cardiology Associates, P.S.C., a private practice group composed of, among others, Defendants Robert Solinger, Allan Rees, and Francisco Elbl, all of whom are also pediatric cardiologists and serve as members of the University of Louisville Medical School (the "Medical School") faculty.  Villafane is currently practicing as a member of Children's Heart Specialists, P.S.C.

Defendant Larry Cook is currently the Executive Vice President for Health Affairs at the University of Louisville, and during the period relevant to this case he was a practicing neonatologist and member of Neonatal Associates, P.S.C.  At that time he was also a member of the Medical School faculty, Chairman of the Medical School's Department of Pediatrics, Chief

of Staff of Defendant Norton Hospitals, Inc. d/b/a Kosair Children's Hospital, and President of the University of Louisville Research Fund.

Defendant Norton Hospitals, Inc. d/b/a Kosair Children's Hospitals ("Kosair") is Kentucky's only free-standing, full-service pediatric hospital.  Villafane, Solinger, Rees, and Elbl all practiced extensively at Kosair.

Plaintiffs' FCA allegation concerns the flow of money between Kosair and Defendant doctors.  The Medical School requires all full-time faculty members to participate in a "Professional Practice Plan,"[2] an arrangement through which they pay a percentage of their private practice revenue to the University of Louisville Medical School Fund ("the Fund").  The Fund, in turn, channels those monies to the University of Louisville Research Foundation ("the Research Foundation"), which disburses the monies for, among other things, Medical School faculty salaries.  The Research Foundation receives monies from other sources besides the Fund, including government contributions, donations, and grants, as well as contributions from hospitals such as Kosair.  But since Defendant doctors' faculty salaries are paid out of a fund to which Kosair is a contributor, it is true that Kosair's contributions to the University of Louisville may ultimately reach Defendant doctors as part of their faculty salary payments, albeit indirectly.

Meanwhile Kosair, like other hospitals, seeks reimbursement from Medicaid[3] for certain

---

[2] This is reportedly not the only contribution Medical School faculty physicians must make from their private practice revenue; they are also obligated to contribute a percentage of that revenue to their respective Medical School Departments.  These funds are in turn spent at the discretion of the Department Chairman.

[3] In their pleadings, the parties refer both to Medicare and Medicaid as the relevant government payor.  The parties have since confirmed that Medicaid is the only relevant payor.  This fact does not change the Court's analysis.

health care services Kosair provides to Medicaid-eligible patients.  Often times, the services result from a referral by one of Defendant doctors.  When requesting reimbursement for these services,[4] Kosair must certify that it has complied with applicable laws and regulations.  It is this certification which provides the grist of Plaintiffs' FCA allegation.  Plaintiffs claim that by virtue of the flow of money between Kosair and Defendant doctors just noted, Kosair (and, to the extent they participate by causing the prohibited referrals and reimbursement requests, the other Defendants) is in violation of certain relevant statutory and regulatory requirements and, therefore, has falsely certified its compliance.

The Court first encountered the AMC exception to the Stark law in its last opinion. *Solinger,* 457 F. Supp. 2d at 756–58.  The Court found that the exception could be available to Defendants, despite Plaintiffs' argument that the alleged Stark law violations had occurred before the exception became effective.  *Id.* at 756–57.  However, the Court found "insufficient information to determine whether the relationship between the university meets the exception," and gave Defendants "an early opportunity" to show that it did, ordering discovery on the FCA allegation alone.  *Id.* at 757–58.

Following the completion of discovery, Defendants filed the instant motion for summary judgment.  Separately, Defendant Larry Cook moved for summary judgment on sovereign immunity grounds, and Defendants jointly moved to exclude the report and testimony of Dr. Richard F. Tompkins, an expert retained by Plaintiffs.  Briefing on these motions was completed in December 2007, and the Court conducted a lengthy conference on January 24, 2008, at which

---

[4]In their complaint, Plaintiffs allege that Kosair also has sought reimbursement for the monies it provided to the Foundation.  Complaint at ¶ 96.  This allegation has been minimally developed and does not appear to constitute the actual basis for Plaintiffs' FCA claim.  Complaint at ¶¶ 139–46.  As such, the Court will consider Plaintiffs' allegation to be that pled in Count I, that Defendants' requests for *reimbursement for services* was improper.

the parties ably explicated their positions and greatly assisted the Court in clarifying the complex

factual and legal issues before it.

II.

Count I of the complaint alleges that Defendants violated the FCA by making fraudulent

claims for Medicaid reimbursement.  The FCA is "designed to protect the Federal treasury," *U.S.*

*ex rel. Pogue v. Am. Healthcorp., Inc.*, 914 F. Supp. 1507, 1512 (M.D. Tenn. 1996), and creates

liability for anyone who:

> (1) knowingly presents, or causes to be presented, to [the Government] . . .
> a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses or causes to be made or used, a false record or
> statement to get a false or fraudulent claim paid or approved by the
> Government; [or]
> (3) conspires to defraud the Government by getting a false or fraudulent
> claim allowed or paid.

31 U.S.C. § 3729(a).  Under the FCA's *qui tam* provisions, private individuals on behalf of the

United States may challenge government payments based upon claims that violate the FCA.[5]  31

U.S.C. § 3730(b); *see also Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005)

(noting that "the *qui tam* provisions seek to encourage whistleblowers to act as private

attorneys-general in bringing suits for the common good," but only to the extent that

"opportunistic plaintiffs" are also discouraged  "from bringing parasitic lawsuits . . . feed[ing]

off a previous disclosure of fraud") (internal citations omitted).  Though "the False Claims Act

was not designed to reach every kind of fraud practiced on the Government," *U.S. v. McNinch*,

356 U.S. 595, 599 (1958), and "claims for services rendered in violation of a statute do not

necessarily constitute false or fraudulent claims under the FCA," *U.S. ex rel. Thompson v.*

---

[5] As noted above, in this case the United States, after considerable study, decided not join in the action.

*Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) ("*Thompson I*"), the FCA certainly "was intended to govern . . . fraudulent acts that cause the government to pay out sums of money to claimants it did not intend to benefit." *Pogue*, 914 F. Supp. at 1513.

FCA actions may be predicated upon a variety of underlying allegations. These include violations of the Stark law and the so-called Anti-Kickback law, 42 U.S.C. § 1320a-7b, both of which are designed to protect against fraudulent overutilization of government-reimbursed healthcare services. *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1047 (S.D. Tex. 1998) ("*Thompson II*"); *Pogue*, 914 F. Supp. at 1513; *see also Thompson I*, 125 F.3d at 902. This is so even though neither the Stark law nor the Anti-Kickback law provides for a private right of enforcement. *Solinger*, 457 F. Supp. 2d at 754 (citing *West Allis Mem'l Hosp., Inc. v. Bowen*, 852 F.2d 251, 255 (7th Cir. 1998)).

Because Plaintiffs base their FCA claim upon a violation of this broad statutory scheme, the evolution of the relevant statutory and regulatory provisions is important to understand. Therefore, in Subsection A, the Court reviews the Anti-Kickback law before proceeding to the Stark law as originally passed in 1989 and amended in 1993. In Subsection B, the Court discusses the regulatory implementations of the Stark law in 2001, 2004, and 2007. Finally, in subsection C, the Court considers the AMC exception as revised and refined within the those regulations.

### A.

Overutilization of government-reimbursed healthcare services is one variety of Medicare and Medicaid fraud. Congress enacted statutory protections to "curb 'certain practices which have long been regarded by professional organizations as unethical . . . and which contribute

6

appreciably to the cost of the [M]edicare and [M]edicaid programs.'"  David M. Deaton, *What is "Safe" About the Government's Recent Interpretation of the Anti-Kickback Statute Safe Harbors? . . . and Since When was Stark an Intent-Based Statute?*, 36 J. Health L. 549, 552 (2003) (citing H.R. Rep. No. 92-231, at 107 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5093).  Yet in doing so, Congress has remained aware that such statutes may "chill[] legitimate and beneficial healthcare arrangements," Deaton, *supra*, at 553 (citing S. Rep. No. 100-109, at 27, *reprinted in* 1987 U.S.C.C.A.N. 682, 707), and has struggled to provide "a bright line rule to give providers and physicians unequivocal guidance as to the types of arrangements that are prohibited."  135 Cong. Rec. H240-01 (daily ed. Feb. 9, 1989) (statement of Rep. Stark).

Prior to the existence of the Stark law, Congress in 1977 enacted the Medicare-Medicaid Antifraud and Abuse Amendments, adding the Anti-Kickback law to the preexisting healthcare fraud protection framework.  Pub.L. No. 95-142, 91 Stat. 1179 (1977).  In its current form, the statute creates liability for, among others, those who:

> knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2).  As is evident from its text, this statute makes intent a key element of any violation.

Since its enactment, "[t]he scope of the Anti-Kickback statute has been a consistent concern of Congress," *U.S. v. Neufeld*, 908 F. Supp. 491, 497 (S.D. Ohio 1995).  One concern was that its broad scope interfered with "legitimate and beneficial healthcare arrangements."  Deaton, *supra*, at 553 (citing S. Rep. No. 100-109 at 27 (1987), *reprinted in* 1987 U.S.C.C.A.N.

682, 707).  At the same time, the statute's intent element often made proving a violation difficult.

Deaton, *supra*, at 554 (citing 135 Cong. Rec. H240-01 (daily ed. Feb. 9, 1989) (statement of

Rep. Stark)).

Eventually, Congress enacted an additional legislative scheme, the so-called Stark law,[6]

as part of the Omnibus Budget Reconciliation Act of 1989.  Pub. L. No. 101-239, § 6204, 103

Stat. 2106, 2236-44 ("Stark I"); *see generally U.S. ex rel. Kosenske v. Carlisle HMA, Inc*., 2007

WL 3490537, *5 (M.D. Pa. Nov. 14, 2007) (discussing the Stark law's structure and passage);

Deaton, *supra*, at 554 (same); Steven D. Wales, *The Stark Law: Boon or Boondoggle? An*

*Analysis of the Prohibition on Physician Self-Referrals*, 27 Law & Psychol. Rev. 1, 5–7 (2003)

(discussing some of the factors motivating the Stark law's enactment). The original incarnation

of the Stark law prohibited physician referrals under Medicare for clinical laboratory services to

facilities with which the physicians had financial relationships.  Congress later expanded this

prohibition to include referrals for certain "designated health services" under both Medicare and

Medicaid to healthcare providers (including hospitals) when the referring physicians have

financial relationships with the providers.  Omnibus Budget Reconciliation Act of 1993, Pub. L.

No. 103-66, § 13562, 107 Stat. 312, 596–605 ("Stark II").

In its current form, the Stark law states that if a physician or a member of his immediate

family has a "financial relationship" with an entity providing healthcare services:

> (A)  the physician may not make a referral to the entity for the furnishing of
> designated health services . . . and
> (B) the entity may not present or cause to be presented a claim under this
> subchapter or bill to any individual, third party payor, or other entity for
> designated health services furnished pursuant to a referral prohibited under

---

[6]The legislation is named for its sponsor, Rep. Fortney "Pete" Stark of California.

8

subparagraph (A).

42 U.S.C. § 1395nn(a)(1).  The regulations implementing the Stark law define a "financial relationship," which may include "a direct or indirect compensation arrangement . . . with an entity that furnishes [designated health services]."  42 C.F.R. § 411.354(a)(1)(ii).  A "compensation arrangement," in turn, can be "any arrangement involving remuneration, direct or indirect, between a physician . . . and an entity."  *Id.* at § 411.354(c).  Most relevant for our purposes is the definition of an indirect compensation arrangement, which is present where:

> (I) Between the referring physician . . . and the entity furnishing [designated health services] there exists an unbroken chain of any number (but not fewer than one) of persons or entities that have financial relationships (as defined [above]) between them [];
> (ii) The referring physician . . . receives aggregate compensation from the person or entity in the chain with which the physician . . . has a direct financial relationship that varies with, or otherwise reflects, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the [designated health services;] and
> (iii) The entity furnishing [designated health services] has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician . . . receives aggregate compensation that varies with, or otherwise reflects, the value or volume of referrals or other business generated by the referring physician for the entity furnishing the [designated health services].

*Id.* at § 411.354(c)(2).  Though the law was intended to prohibit fraudulent behavior by physicians and others in the healthcare marketplace, Congress also recognized that "certain business relationships between physicians and health care entities are both cost effective and beneficial to patient care."  *Kosenske*, 2007 WL 3490537, at *6.  Thus, Congress hoped that the Stark law would provide "bright line rules" to guide physicians and healthcare providers.  For a variety of reasons, this objective has proven elusive.

B.

After Congress passed the Stark law, the Health Care Financing Administration

9

("HCFA") and its successor, the Centers for Medicare and Medicaid Services ("CMS") issued

three sets of implementing regulations over the next seven years.[7]  A common trend of this

regulatory activity was to identify and preserve legitimate and common financial arrangements

within the healthcare services marketplace.

Explaining the forthcoming regulatory approach as it issued Phase I, the agency noted

that:

> Prior to enactment of [the Stark law] there were a number of studies, primarily in
> academic literature, that consistently found that physicians who had ownership or
> investment interests in entities to which they referred ordered more services than
> physicians without those financial relationships . . . . This correlation between
> financial ties and increased utilization was the impetus for [the Stark law] . . . .
> The approach chosen by the Congress . . . . imposes a blanket prohibition on the
> submission of Medicare claims . . . for certain [designated health services] when
> the service provider has a financial relationship with the referring physician,
> unless the financial relationship fits into one of several relatively specific
> exceptions.  Significantly, no wrongful intent or culpable conduct is required [for
> a violation to occur].

Phase I at 859; *see generally* Wales, *supra,* at 3–7 (discussing the studies and other

developments motivating the Stark law, as well as the subsequent legislative activity prior to the

promulgation of Phase I).  Despite its desire to address this "correlation between financial ties

and increased utilization," HCFA also sought "to minimize the impact of the rule on many

common physician group governance and compensation arrangements."  Phase I at 859–60.  To

---

[7]HCFA issued "Phase I" of its regulations on January 4, 2001.  These regulations (with one exception not relevant to the instant case) became effective on January 4, 2002.  *Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships*, 66 Fed. Reg. 855 ("Phase I").
CMS issued "Phase II" of the Stark regulations in the form of an interim final rule implementing the portions of Stark II not addressed in the Phase I regulations.  *Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships*, 69 Fed. Reg. 16,053 (March 6, 2004) ("Phase II"). This interim final rule became effective on July 26, 2004.
CMS issued "Phase III," its final set of regulations implementing Stark II, three years later.  *Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships*, 72 Fed. Reg. 51,011 (September 5, 2007) (codified at 42 C.F.R. parts 411 and 424) ("Phase III").  These regulations became effective on December 4, 2007.

that end, HCFA "tried . . . to interpret the [Stark law's] prohibitions narrowly and the exceptions broadly . . . . [as] we should be cautious in interpreting [the Stark law] so broadly as to prohibit potentially beneficial financial arrangements." *Id.* Echoing this idea, the Phase II regulations emphasized that "in particular," CMS was trying "to preserve the [Stark law's] core statutory prohibition while providing sufficient flexibility to minimize the impact of the rule on many common business arrangements." Phase II at 16,056.

The Phase III regulations made final many provisions of the Phase II interim rule, with some changes. In Phase III, CMS explained that unlike the FCA and the Anti-Kickback law, both of which include an intent element, the Stark law "is a strict liability statute," and that therefore CMS has no "authority to waive [enforcement of its sanctions] for 'minor' and 'technical' violations, or violations stemming from non-abusive arrangements." Phase III at 51,026. But again, CMS indicated it hoped "to minimize the impact of the rule on many common business arrangements," and noted that "Phases I, II, and III . . . are intended to be read together as a unified whole." *Id.* at 51,013. In conducting its analysis the Court has endeavored to follow these admonitions.

C.

HCFA and CMS have devoted considerable attention to the legitimate "common business arrangements" such as academic medical practices that merit an exception from the Stark law's prohibitions. *See* Phase I at 915–17. Though the text of the Stark law itself states that special rules should apply to "faculty practice plans," 42 U.S.C. § 1395nn(h)(4)(B)(ii), HCFA found that "academic medical practices raise numerous questions under [the Stark law] that are not adequately addressed" by these special rules. Phase I at 916. In particular, the agency noted

11

that:

> Academic medical settings often involve multiple affiliated entities that jointly deliver health care services to patients . . . . There are frequent referrals and monetary transfers between these various entities, and *these relationships raise the possibility of indirect remuneration for referrals* . . . . [T]he unique circumstances of a faculty practice[] includ[e] the symbiotic relationship among faculty, medical centers, and teaching institutions, and the educational and research roles of faculty in these settings.

*Id.* (emphasis added)*; see also Self-Referral: Attorneys Comment on Stark II Final Rule, Applauding Added Flexibility for Providers*, Medicare Rep. (BNA) No. 12, at 208 (February 16, 2001) ("Teaching hospitals and medical schools ordinarily give financial support to affiliated physician practices through funding for research/teaching activities").  HCFA concluded that:

> Though the relevant [Stark law] provision [42 U.S.C. § 1395nn(h)(4)(B)(ii)] is somewhat obscure, we believe it demonstrates congressional intent to address the circumstances of physicians practicing in academic medical settings.  We do not believe, however, that the core problem of how to treat academic medical practices under [this provision] is amenable to resolution under the [current statutory language]; the problem lies elsewhere.

Phase I at 916.  Consequently, HCFA addressed the "fundamental need" for an "exception for payments to faculty of academic medical centers that takes into account the unique circumstances of a faculty practice" by codifying at 42 C.F.R. § 411.355(e) as "a separate compensation exception . . . payments to faculty of academic medical centers that meet certain conditions."  Phase I at 916.

Later, the agency realized that this initial formulation was "overly restrictive," given the "many variants of the basic academic medical center arrangement."  Phase II at 16,108–09. Therefore CMS "revis[ed] the rule to make it easier to qualify as an academic medical center," since as the agency noted, the purpose of the AMC exception is "to provide protection under [the Stark law] for academic medical centers[, which] often have complex compensation

12

arrangements with their faculty." *Id.*

Phase III represented yet another liberalization of the AMC exception's requirements. In those regulations, CMS "adopt[ed] the Phase II [interim] rule," designed to "broaden the applicability of the academic medical centers exception." Phase III at 51,036. And the agency again reiterated its purpose-oriented approach, first outlined in Phase I, seeking at bottom to "ensure that the [AMC] arrangements pose no risk of fraud or abuse." *Id.*

The parties have noted and the Court has confirmed that almost no case law explores the precise contours of the AMC exception.[8] The Court has found limited guidance and nothing approaching a jurisprudential consensus about the meaning or applicability of the AMC's many elements. Therefore the Court has looked to the history and evolution of the exception for its primary guidance. From the following analysis the Court has concluded that throughout their successive rulemakings HCFA and CMS have focused on achieving a goal, namely prevention of healthcare fraud, more than on ensuring rigid adherence to any particular regulatory provision. This purpose and the agency's explanatory comments must guide the Court's interpretation of the AMC exception's elements.

The Court's previous determination that it owed deference to the Phase I regulations, *Solinger*, 457 F. Supp. 2d at 756, is no less applicable to the Phase II and Phase III regulations, which were explicitly guided by Phase I's analysis of the legislative history. *See* Phase II at 16,055–56; Phase III at 51,013. The Court concludes that like Phase I, the Phase II and III regulations are reasonable and permissible constructions of the Stark law, deserving of deference

---

[8]This is all the more regrettable given what one commenter has described as the "inordinate complex[ity]" of the Stark law and regulations, which, he lamented, has resulted in a "Homeric odyssey" for attorneys attempting to advise clients on the "troublesome and elusive goal" of compliance. Wales, *supra*, at 22–23 (collecting numerous comments criticizing the complexity of the Stark law).

by this Court.  *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843

(1984); *Solinger*, 457 F. Supp. 2d at 756–57.[9]

III.

The applicability of the AMC exception to these circumstances is a legal matter which

the Court must decide based on the facts and the law.  *See, e.g., Kosenske*, 2007 WL 3490537, at

*6 (finding it to be a task for the court to determine the applicability of a Stark law exception).

If it applies as a matter of law, then Plaintiffs' FCA claim, which is based upon the Stark law,

cannot proceed.  Therefore, the Court's task is twofold: to interpret the parameters of the AMC

exception – what each criterion requires – then to evaluate whether the evidence satisfies each

requirement as interpreted.

Though courts have said that a defendant bears the burden of establishing his eligibility

for an exception to the Stark law, *see, e.g., U.S. v. Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill.

2006), none has discussed the precise nature of it.  *See, e.g.,  Kosenske*, 2007 WL 3490537 at

*7–*11 (noting only that evidence on various prongs of a Stark law exception "fulfills,"

"adequately addresses," "plainly satisfies," "is sufficient," and "complies with" the requirements

of that exception, without more)*; U.S. ex rel. Roberts v. Aging Care Home Health, Inc.,* 474 F.

Supp. 2d 810, 818 (W.D. La. 2007); *Rogan,* 459 F. Supp. 2d at 716.  However, when deciding

legal issues based upon facts and law, this Court determines whether a party has met its burden

of persuasion based upon a preponderance of evidence.  2 Kenneth S. Broun, McCormick on

---

[9]The Court explained in its prior opinion that "since the AMC exception is contained in the Code of Federal
Regulations, it does not arise from a change to the statute itself," but rather from an "administrative interpretation of
the meaning Congress intended when creating the statute."  Thus application of the AMC to events occurring prior to
Phase I was not "retroactive" at all.  The Court also noted that even under a traditional retroactivity analysis, the
Phase I regulations would apply.  *Solinger*, 457 F.Supp.2d at 756.

Evid. § 339 (6th ed. 2006); *see also* 32A C.J.S. *Evid.* § 1311 ("Ordinarily, in civil actions, a fact is sufficiently proved by a preponderance of evidence, and the verdict or finding should be based on such preponderance").

For ease of discussion and analysis, the Court has grouped the AMC exception's requirements into several categories.

A.

The first category of AMC exception criteria imposes four requirements on the referring physicians themselves.  Specifically, the regulations require that the referring physicians be "*bona fide* employee[s] of a component of the academic medical center on a full-time or substantial part-time basis,"[10] that they be "licensed to practice medicine in the State(s) in which [they] practice[] medicine," and that they have "a *bona fide* faculty appointment at the affiliated medical school or at one or more of the educational programs at the accredited academic hospital."  42 C.F.R. §§ 411.355(e)(1)(i)(A) – (C).  Defendants clearly satisfy these three requirements.

The parties' dispute focuses on the requirement that the referring physician faculty members provide a certain level of academic services.  They must:

> [p]rovide[] either substantial academic services or substantial clinical services (or a combination of academic services and clinical teaching services) for which the faculty member receives compensation as part of his or her employment relationship with the academic medical center.  Parties should use a reasonable and consistent method for calculating a physician's academic services and clinical teaching services.  A physician will be deemed to meet this requirement if he or she spends at least 20 percent of his or her professional time or 8 hours per week

---

[10]A "component" of an AMC is defined as "an affiliated medical school, faculty practice plan, hospital, teaching facility, institution of higher education, departmental professional corporation, or nonprofit support organization whose primary purpose is supporting the teaching mission of the academic medical center."  42 C.F.R. § 411.355(e)(1)(i)(A).

> providing academic services or clinical teaching services (or a combination of academic services or clinical teaching services).  A physician who does not spend at least 20 percent of his or her professional time or 8 hours per week providing academic services or clinical teaching services (or a combination of academic services or clinical services) is not precluded from qualifying under this paragraph.

*Id.* at § 411.355(e)(1)(i)(D).  The presence of the qualifying term "substantial" creates uncertainty as to this requirement's reach.  The rule's safe harbor provision does not lessen this uncertainty, because the same rule emphasizes that a physician who fails to meet this safe harbor "is not precluded from qualifying" under this requirement.

Plaintiffs argue that Defendants fail to meet this requirement because the only assessment of their time is based on very general estimates by Defendant doctors themselves.  Plaintiffs' expert, Dr. Richard Tompkins, concluded that Defendants' timekeeping system was a "sham," and that no "reasonable and consistent method" was in place "for calculating a physician's academic services and clinical teaching services," as suggested by the rule.  Dr. Tompkins believed that Defendants' failure to use a timekeeping system recommended in a 1982 study by Arthur Young & Company was nearly dispositive on this question, and he identified numerous specific infirmities in the timekeeping system used by Kosair.[11]

In their own affidavits and depositions Defendants attest that as full-time faculty members, they provided "substantial" academic and clinical services and that they have received awards recognizing the quality of their teaching.  As indicated at conference, Defendant doctors

---

[11]As noted above, Defendants have moved to exclude Dr. Tompkins' testimony and report under Fed. R. Civ. P. 37(c)(1), since Dr. Tompkins was not disclosed by Plaintiffs until approximately five months after all FCA-related discovery was to be concluded, and only one week prior to the dispositive motions deadline.  Though the Court's belief as to the prejudicial value of a tardily-disclosed expert report remains as significant as it was in *Bench Billboard Co. v. Louisville/Jefferson County Metro Gov't*, 2007 WL 1662663, *1 (W.D. Ky. June 6, 2007), the Court generally desires to be as informed as possible on complex issues such as those currently before it.  That desire, combined with the limited persuasiveness of Tompkins' report (as the Court will discuss below), has led the Court to consider Dr. Tompkins' report during its evaluation of the applicability of the AMC exception.

are responsible for training over one hundred medical residents and students at Kosair.[12]

Therefore, the Court finds that Defendants' affidavits and testimony are inherently reasonable.

If taken at face value, their evidence supports the conclusion that they provided substantial

academic and clinical teaching services.

The Court finds significant that the regulations do not require that a physician meet the

safe harbor or use any particular timekeeping system.  Indeed, as CMS noted in Phase II:

> we did not [in Phase I] specify what constitutes "substantial academic services or
> clinical teaching services" because we believe it will vary with the precise duties
> of a given faculty member, and *we wanted to provide academic medical centers
> with flexibility* . . . . [The safe harbor] is not an absolute requirement, and . . .
> physicians who do not qualify under this "safe harbor" may still be providing
> substantial academic services or clinical teaching services, depending on the
> circumstances.

Phase II at 16,109–10 (emphasis added).  At bottom, "[t]he purpose of this condition is to ensure

that protected physicians are truly engaged in an academic medical practice . . . . [not]

provid[ing] only occasional academic or clinical teaching services or . . . principally [acting as]

community rather than academic medical center practitioners."  Phase I at 916.  In this context,

Dr. Tompkins' report and Dr. Villafane's personal opinion about proper teaching methods take

far too narrow a view of the regulations and are only marginally relevant.

Though the quality or accuracy of Defendants' time reports may leave something to be

desired, they are not so deficient as to actually support Plaintiffs' proposition.  More importantly,

---

[12]Plaintiffs and their expert Dr. Tompkins urge the Court to find persuasive the fact that no pediatric cardiology residency was offered at the Medical School or at Kosair during the relevant period, arguing that this raises the question of who was being taught by Defendant doctors.  When questioned on this point at conference, Defendants noted that, as listed in the very documents to which Plaintiffs and Dr. Tompkins referred in arriving at this conclusion, a *pediatrics* residency existed at Kosair during the relevant period, and that it was usually pediatrics residents, during their pediatric cardiology *rotation*, whom Defendant doctors were teaching, in addition to any medical students present at Kosair.

the conclusion is inescapable that Defendants do provide substantial academic and clinical services.  Defendant doctors' academic responsibilities were enormous, requiring supervision of more than a hundred medical students and residents at Kosair.  Every day and perhaps more often, at least one of Defendant doctors conducts rounds at Kosair to review the status of each patient under their care at that facility.  Sometimes such reviews will take only a few moments; other times with more complicated patients, the reviews may take longer.  In any event, this is how residents are taught.  Additionally, Defendants' annual work assignments and performance reviews, as well as their curricula vitae indicate that they were tasked with and completed substantial academic and clinical services.

The Court finds no indication that either Congress or HCFA/CMS intended that the fate of an academic medical center would hang upon its particular timekeeping practices where its broad operations seem entirely appropriate.  Quite simply, the record before the Court leaves little doubt that Defendant doctors were "truly engaged in an academic medical practice," as this requirement is intended to ensure.

## B.

The second category of requirements under the AMC exception concerns the total compensation paid to referring physicians, and mandates that the compensation of the referring physician meet all three of the following requirements:

> (A) The total compensation paid by each academic medical center component to the referring physician is set in advance.
> (B) In the aggregate, the compensation paid by all academic medical center components to the referring physician does not exceed fair market value for the services provided.
> (C) The total compensation paid by each academic medical center component is not determined in a manner that takes into account the volume or value of any referrals or other business generated by the referring physician within the

18

academic medical center.

42 C.F.R. §§ 411.355(e)(1)(ii).  The purpose of this requirement is to make sure that physicians

are paid based on the value of their work rather than the value of their referral business to the

hospitals.

Plaintiffs argue as a threshold matter that "the total compensation paid by each academic

medical center component to the referring physician" should be interpreted to mean  Defendant

doctors' *entire* income, whether derived from their private practices or their faculty salaries.

They say that this is a reasonable construction because Defendant doctors' private practices are

"taxed" by various arms of the Medical School, and because Dr. Cook at one point indicated that

he thought a physician's private practice could be considered an "academic medical center

component."  The Court respectfully disagrees.  Such an interpretation would require the

Medical School to exert control over the internal salary decisions of any private practice whose

physicians were faculty members.  Such an approach not only falls well outside the scope of the

Stark law's prohibition on self-referrals, but also seems utterly impracticable.  Therefore the

Court will refer only to the faculty salaries paid to Defendant doctors.

1.

Building off the definition set forth in the Stark law itself, 42, U.S.C. § 1395nn(h)(3), the

Stark regulations define fair market value as:

> the value in arm's length transactions, consistent with the general market value.
> "General market value" means . . . the compensation that would be included in a
> service agreement as the result of bona fide bargaining between well-informed
> parties to the agreement who are not otherwise in a position to generate business
> for the other party . . . at the time of the service agreement . . . . Usually, the fair
> market price is . . . the compensation that has been included in bona fide service
> agreements with comparable terms at the time of the agreement, where the price
> or compensation has not been determined in any manner that takes into account

the volume or value of anticipated or actual referrals."

42 C.F.R. § 411.351.  HCFA provided the following additional guidance for determining when a

payment for services provided is fair market value:

> we believe the relevant comparison is aggregate compensation paid to physicians
> practicing in similar academic settings located in similar environments.  Relevant
> factors include geographic location, size of the academic institutions, scope of
> clinical and academic programs offered, and the nature of the local health care
> marketplace . . . . *we intend to accept any method* [for establishing fair market
> value] *that is commercially reasonable and provides us with evidence that the
> compensation is comparable to what is ordinarily paid for an item or service* in
> the location at issue, by parties in arm's-length transactions who are not in a
> position to refer to one another . . . . The amount of documentation that will be
> sufficient to confirm fair market value . . . will vary depending on the
> circumstances in any given case; that is, there is no rule of thumb that will suffice
> for all situations.

Phase I at 916, 944 (emphasis added); *see also* Phase II at 16,107.  While Phase II established a

voluntary safe harbor for compensation calculated pursuant to one of two methodologies

outlined in Section 411.351 of the interim rule, this safe harbor was deleted by the agency in

Phase III given how "impractical" and "infeasible" compliance with it had proven to be.  Phase

III at 51,015.

Defendants have offered evidence that their faculty compensation is in line with the

national salary data compiled in the Association of Administrators in Academic Pediatrics'

Medical School Pediatric Faculty Compensation Surveys.  Defendants' Joint Motion for

Summary Judgment, Exhibit Q.  Though the excerpts of these surveys are, as Plaintiffs observe,

less clear than one might hope, they nevertheless generally support Defendants' contention.  For

example, from the surveys' analysis of "Medical School Pediatric Faculty Salaries," one can

determine whether a certain salary figure is within the 20th, 50th, or 80th percentile.

Additionally, Defendant doctors and Plaintiff Villafane himself have testified that their faculty

20

salaries were at or below fair market value.

Plaintiffs respond that Defendants' failure to comply with the Phase II safe harbor provisions precludes any finding that Defendant doctors' faculty salaries were set at fair market value. Furthermore, Plaintiffs' expert, Dr. Tompkins, notes that Defendant doctors' salaries were "consistently above the 75th percentile and, in the case of Dr. Cook, consistently above the 90th percentile." Plaintiffs' Response to Defendants' Motion for Summary Judgment, Exhibit 16. For a number of reasons, Dr. Tompkins' report falls far short of overcoming Defendants' evidence.

As a threshold matter, Dr. Tompkins' conclusions about Defendants' failure to meet the safe harbor are immaterial because CMS has recently eliminated the very safe harbor he cites. More to the point, Dr. Tompkins does not say that anyone's salary was either above fair market value or was unreasonable, but merely makes a series of statistical observations.[13] For example, he found that Dr. Cook's salary was always near or above the high end of the range for neonatologists. The Court finds such a comparison unremarkable given the myriad of Dr. Cook's other duties and responsibilities at the Medical School. Indeed, CMS has noted that "the fair market value of administrative services may differ from the fair market value of clinical services." Phase III at 51,016. Thus, comparing Dr. Cook to an "ordinary" neonatologist is to compare "apples and oranges." As for the rest of Defendant doctors, every one appears to be highly qualified and arguably at or near the top of his profession, and Dr. Tompkins' findings

---

[13]Any definition of fair market value that would automatically deem anything over the median or indeed, anything at the 80th percentile, as necessarily *not* being fair market value would seem illogical. After all, any distribution of salaries in a marketplace will show some higher or lower than others. Provided a salary is well within a statistical distribution defining the market as a whole, it seems difficult to argue that it is not fair market value. The Court suspects this is in part why the rulemakers opted against defining fair market value in terms of standard deviations and other statistical measurements, and instead did so in terms of "arm's-length transactions."

suggest only that Defendant physicians were paid at a level consistent with their abilities, not that they were paid at an unreasonably high level.

Defendants have complied precisely with the regulations, presenting a "comparison . . . [to] aggregate compensation paid to physicians practicing in similar academic settings located in similar environments . . . demonstrating that their compensation is comparable to that of similarly situated academics." Phase I at 916,944. From this evidence, the Court concludes that Defendants have met the standards explained in the permissive language of this requirement.

2.

The Court next considers the requirement that faculty physicians' compensation not be "determined in a manner that takes into account the volume or value of any referrals or other business generated by the referring physician within the academic medical center." This provision could be interpreted in either of two ways. Under one view, compensation would only "take into account the volume or value of any referrals or other business generated" if it varied proportionally with increases or decreases in such referrals or other business generated, either during the term of the compensation arrangement or from one compensation arrangement to the next (i.e. year to year). Under an alternative view, the mere existence of a compensation arrangement could "take into account the volume or value of any referrals or other business generated," whether or not it varied. That is, if the very *existence* of a compensation arrangement was a result of "the volume or value of any referrals or other business generated," this requirement would be violated. *See* Deaton, *supra*, at 562.

Plaintiffs argue that Kosair would not have contributed to the Research Foundation *at all* had their support not funded physicians making referrals to Kosair, and that the Court should

interpret this as contrary to the AMC exception.  For the reasons that follow, the Court concludes

that to adopt such an interpretation is contrary to the clear statutory and regulatory purpose.

In Phase I, HCFA devoted an entire section of its preamble to clarification of this

requirement, stating that:

> A compensation arrangement does *not* take into account the volume or value of
> referrals or other business generated between the parties if the compensation is
> fixed in advance and will result in fair market value compensation, and the
> compensation does not vary *over the term of the arrangement* in any manner that
> takes into account referrals or other business generated.

Phase I at 877–78 (emphasis added).  This explanation indicates that a fixed payment can "take

into account the volume or value of any referrals or other business generated," but likely only if

that fixed payment is in excess of fair market value, i.e. if it includes some sort of payment above

and beyond the market value of the physician's services.  *See also* Phase II at 16,059; Phase III

at 51,029.  Further evidence in support of this interpretation appears in the current rule itself:

> Unit-based compensation (including time-based or per-unit of service-based
> compensation) is deemed not to take into account "the volume or value of
> referrals" if the compensation is fair market value for services or items actually
> provided and does not *vary* during the course of the compensation arrangement in
> any manner that takes into account referrals of [designated health services].

42 C.F.R. § 411.354(d)(2) (emphasis added); *see also* Deaton, *supra*, at 566.  Notably, no

instruction to go beyond the face of the compensation arrangement and consider the parties'

intent appears in either of these explanations.

At least one commenter has argued that text and legislative history indicate that:

> the better interpretation of the volume-or-value standards . . . focuses on the
> formula the parties use to determine compensation *over the term of the
> arrangement*, not on whether referrals [or other business generated] were
> considered in structuring the arrangement or the intent of the parties.  The test
> should be an objective one: whether the compensation can increase or decrease
> during the term of the agreement based on referrals.

Deaton, *supra*, at 563–64 (emphasis added).  And perhaps most logically, introduction of an intent element would be contrary to the Stark law's strict liability scheme.

Thus, where no violation appears on the face of the arrangement, either in the form of above-fair-market-value compensation or of a provision allowing for increases or decreases in payment based on the number of referrals made, the text and history of the Stark law's desire to create a "bright-line rule" would seem to argue against establishing a violation on the basis of intent alone.  Deaton, *supra*, at 565–66.[14]  As such, the Court is convinced that when, as here, the faculty salary paid to the physician is initially set at fair market value and where the faculty salary does not vary once set, this requirement is easily met.

Plaintiffs cannot show that Defendant doctors' faculty salaries[15] varied *during* a given fiscal year based on the number of their referrals to Kosair, since the Medical School's payments to Defendant doctors were set in advance via Personnel Action Forms.  Nor, as noted above, can Plaintiffs show that Defendant doctors' faculty salaries were set above fair market value. Plaintiffs did offer statistical evidence purporting to indicate a strong correlation between the net

---

[14]The Court has found no cases directly on point as to this issue, but it takes limited support for its chosen interpretation from a case considering the Stark law's prohibitions upon certain property leasing arrangements.  This is of course an entirely different situation from that currently before the Court.  In that case, a district court rejected the idea that a lease rate "was determined in a manner that took into account the value of patient referrals" where the lease rate was not above fair market value and did not vary "because of patient referrals," without looking beyond the structure of the agreement to examine the intent of the parties in making it.  *U.S. ex rel. Goodstein v. McLaren Reg'l Med. Center*, 202 F. Supp. 2d 671, 686 (E.D. Mich. 2002).  However, the court subsequently held in response to the defendant's application for fees and costs that the Government was "substantially justified" and not "unreasonable" in proceeding under such an intent-based theory.  *U.S. ex rel. Goodstein v. McLaren Reg'l Med. Center*, 2003 WL 25296870, *3–4 (E.D. Mich. Feb. 28, 2003).

[15]Plaintiffs also analyze the change in Kosair's contributions to the Research Foundation from year to year, arguing that there is a correlation between increases in these contributions and increases in the net inpatient revenue generated by Defendant doctors for Kosair.  As is evident from the text of this section of the regulations, the Stark law's prohibitions focus on the *compensation paid to Defendant doctors*, not the amounts contributed that may support those salaries.  Therefore the Court believes that this section of the regulations requires only that each Defendant doctor's *faculty salary* not be "determined in a manner that takes into account the volume or value of any referrals or other business generated by the referring physician within the academic medical center."

inpatient revenue generated for Kosair by Defendant doctors and the amount paid annually in faculty salaries by the Medical School to those doctors.  Plaintiffs' Response to Defendants' Joint Motion for Summary Judgment, Exhibit 22.  The Court has reviewed this evidence and finds it surprisingly unsupportive of the proposition for which Plaintiffs cite it.  The data clearly show that Dr. Cook, who generated substantially more inpatient revenue for Kosair than the rest of Defendant doctors, received a significantly higher faculty salary from the Medical School. However, as noted above, Dr. Cook's high salary is hardly surprising given his greater responsibilities within the University.  And without Dr. Cook's salary in the analysis, the annual "correlation" between faculty salary payments and net inpatient revenue generated might not be nearly as strong as Plaintiffs suggest.

In theory, a year-to-year analysis could show the kind of correlation which Plaintiffs assert exists.  But Plaintiffs' one-year-snapshot charts do not provide such an analysis.   Rather, the Court's review of the data reveals that, as in the case of Dr. Elbl, some faculty salaries would *drop* from year to year, even though the receipient doctors had *increased* (in some cases, substantially) the amount of inpatient revenue they generated for Kosair.  In other instances, as was the case for Drs. Solinger and Cook, certain doctors' faculty salaries steadily increased from 1998 through 2001 seemingly without regard to whether the net inpatient revenue they generated for Kosair increased or decreased (which it did, often precipitously) throughout the period.

This analysis refutes the idea that referrals were either being encouraged or rewarded via the amounts at which faculty salary payments were set from year to year.  To the contrary, Defendants have established that Defendant doctors' faculty salaries are not "determined in a manner that takes into account the volume or value of any referrals or business generated by he

25

referring physician within the academic medical center."  And because the doctors' faculty

salaries are set in advance at fair market value, the Court finds that Defendants have satisfied this

category of the AMC exception's requirements.

### C.

The next category of requirements under the AMC exception consists of two related

subcategories: (1) issues of accreditation, affiliation and staffing, and (2) issues of organization

and internal financial transfers between the academic institution and the hospital.  Plaintiffs

contest Defendants' showing as to the requirements in each.

### 1.

Under the first subcategory, the purported AMC must consist of:

(i) An accredited medical school . . . or an accredited academic hospital[;][16]
(ii) One or more faculty practice plans affiliated with the medical school, the affiliated hospital(s), or the accredited academic hospital; and
(iii) One or more affiliated hospitals in which a majority of the physicians on the medical staff consists of physicians who are faculty members and a majority of all hospital admissions is made by physicians who are faculty members[.]

42 C.F.R. §§ 411.355(e)(2).  Plaintiffs do not contest that the first two requirements are met, but

assert that Defendants have made an insufficient showing as to the third.

From its inception, the AMC exception has contained the requirement that a majority of

the physicians on the medical staff be faculty members and that a majority of all hospital

admissions be made by faculty members.  This requirement is designed to ensure that the

facilities are "sufficiently integrated into an academic medical center" and "that the relationship

between the components is sufficiently focused on the academic medical center's core mission."

---

[16]An accredited academic hospital is defined by the rule as being "a hospital or a health system that sponsors four or more approved medical education programs."  42 C.F.R. § 411.355(e)(3).

Phase III at 51,037; *see also* Phase II at 16,109.  Defendants have provided data showing that the majority of the staff at Kosair are Medical School faculty members and that those faculty members generate the majority of the hospital's net revenue.  In the absence of other evidence, the Court concludes that this evidence permits the reasonable inference that the majority of admissions to Kosair are ordered by faculty physicians.

In evaluating the permissibility of such an inference, the Court is mindful of CMS's extremely permissive language regarding this requirement, which indicates that CMS did not want the regulations applied in a hyper-technical manner.[17]  CMS seemed more concerned with the "core mission" of the AMC than with a strict and unforgiving application of any single requirement.

Ignoring all of Defendants' evidence and the inference it reasonably supports would be at odds with the purpose of the AMC exception. *Cf. Rogan*, 459 F. Supp. 2d at 713 n.10 (refusing to adopt an interpretation of the Stark law that, though possible, "would be contrary to the manifest purpose of the statute").  The Court finds that Defendants have adequately demonstrated that their arrangement is "sufficiently focused on the academic medical center's core mission," and that therefore Defendants have satisfied the staffing and affiliation requirements of the AMC exception.

2.

The AMC exception also imposes three requirements upon the organization and financial transfers among the entities of which the purported AMC is comprised:

---

[17]The purpose-oriented focus of this requirement is evident, for example, in CMS's willingness to allow a hospital to "include any faculty, including courtesy and volunteer faculty, in determining whether it qualifies under these tests," and to permit the hospital to exclude, for purposes of these calculations, "residents and non-physician professionals."  Phase II at 16,109.

> (A) All transfers of money between components of the academic medical center must directly or indirectly support the missions of teaching, indigent care, research, or community service.
> (B) The relationship of the components of the academic medical center must be set forth in one or more written agreements or other written documents that have been adopted by the governing body of each component.
> (C) All money paid to a referring physician for research must be used solely to support *bona fide* research or teaching and must be consistent with the terms and conditions of the grant.

42 C.F.R. § 411.355(e)(1)(iii).  Plaintiffs do not question that the first and third requirements are met, but argue that the relationship between Kosair and the Medical School is not sufficiently set forth in writing.

Plaintiffs note the absence of a lengthy, detailed contract between Kosair and the Medical School and the contrast with the contracts governing the relationships between the Medical School and other area hospitals.[18]  Plaintiffs also note that managerial personnel at Kosair were unaware of any contract requiring them to contribute to the Medical School.  As a result, Plaintiffs argue, Kosair's payments to the Foundation were "under the table" payments "to give the Pediatric faculty members incentive to generate business" for Kosair, since the payments were not specifically mandated by an identified document.  Plaintiffs' Response to Defendants' Joint Motion for Summary Judgment at 31.

However, Defendants' evidence describes a relationship between Kosair and the Medical School's Department of Pediatrics dating back to 1962.  That year the two parties signed an agreement purporting to establish a "continuing relationship."  This "Agreement between University of Louisville and Children's Hospital [as Kosair was then known]" was signed by

---

[18]Plaintiffs have offered by way of comparison the agreement between the University of Louisville OB/GYN Department and Alliant Health System, as well as the agreement between The Medical School and Norton Hospital pertaining to cardiology, internal medicine, and medical oncology.  Plaintiffs' Response to Defendants' Joint Motion for Summary Judgment, Exhibits 18, 19.

both the President of Children's Hospital and the President of the University.  In it, Kosair and

the University agreed, among other things, that "[t]he Chairman of the University's Department

of Pediatrics will serve as Chief of Staff of [Kosair]," that "the University and [Kosair] shall

agree upon the number of interns and residents needed," and that the agreement "shall be

automatically continued" unless either party notifies the other of its intention to withdraw.

Defendants' Joint Motion for Summary Judgment, Exhibit E.

    Defendants also have provided the Court with several examples of documents that both

the Medical School and Kosair approve annually, which provide further evidence of such a

"continuing relationship."  Defendants' Joint Motion for Summary Judgment, Exhibit I.  Each

document is in the form of a memorandum from Kosair Administrator Douglas Eighmey to Dr.

Cook (in his capacity as Chairman of the Medical School's Department of Pediatrics), and all are

dated between May and July of the relevant year.  Each one memorialized the amount of support

Kosair provided to the Foundation for a given year.  With one exception,[19] they always included

Eighmey's statement that "[p]ursuant to our agreement, I will instruct Finance, by copy of this

memorandum," to send a certain amount of money to the Medical School, characterized as

"financial support to the Department of Pediatrics."  The memoranda were signed by Dr. Cook

and initialed by Eighmey.  Defendants argue that the arrangement established and reflected in

these documents is that "[t]he Medical School will use Kosair to teach its medical students and

residents, and Kosair will contribute to the salaries of the Medical School faculty."  Defendants'

Joint Reply at 14.

---

    [19] The lone exception to this template is the memorandum dated May 5, 1998, which is worded slightly
differently, requests "a spread sheet . . . on how this support is used," and indicates that Eighmey is "always" sent
one.  Defendants' Joint Motion for Summary Judgment, Exhibit I.

In view of this evidence, the Court finds no validity in Plaintiffs' assertion that Kosair is making "under the table" payments to the Foundation.  No authority requires a specific type of documentation to memorialize the relationship between the AMC components.  Indeed, CMS clearly says exactly the opposite:

> We did not intend to restrict the [required] written agreement to a single document . . . . [I]t is necessary [only] that the relationship of the components be memorialized in writing *or that there be a clearly established course of conduct that is appropriately documented.*

Phase II at 16,110 (emphasis added).  The permissiveness of this language is obvious.  As elsewhere in this regulatory framework, CMS seems unwilling to apply its own rule in a hyper-technical manner.  Rather, the agency desires to achieve a certain goal instead of simply ensuring compliance with technicalities.

Nothing about the absence of a more sophisticated and lengthier contract suggests any deception or subterfuge on Defendants' part.  The documents which Kosair and the Medical School have exchanged are entirely consistent with the course of conduct between them and with the permissive nature of this requirement.  Collectively, they demonstrate and verify an ongoing agreement.  Thus, the Court finds that Defendants have met this requirement of the AMC exception.

### D.

Finally, the AMC exception includes a requirement that "[t]he referring physician's compensation arrangement . . . not violate the anti-kickback statute . . . or any Federal or State law or regulation governing billing or claims submission."  42 C.F.R. §§ 411.355(e)(1)(iv).  For our purposes that means that Defendants must avoid the inference that any of them "knowingly and willfully" paid or received money to induce patient referrals.  42 U.S.C. § 1320a-7b(b)(2).

The Sixth Circuit has not spoken explicitly to the question of whether payments made partly, but not entirely, to induce referrals would satisfy the intent element of the Anti-Kickback statute.  In analyzing that question, some courts have adopted the so-called "one purpose" test, which holds that the intent element of the Anti-Kickback statute can be met if payments to physicians are to *any* extent motivated by an intent to induce referrals.  *U.S. v. Greber*, 760 F.2d 68, 71 (3d Cir. 1985).  However, this approach is by no means universally accepted.  *See, e.g., U.S. v. Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d 20, 30 (1st Cir. 1989).[20]

Given courts' unsettled views of the "one purpose" test and the fact that its application here would seem contrary to the rulemakers' explicit goal of allowing certain physician compensation arrangements *despite* the possibility of  "indirect remuneration for referrals," Phase I at 916, the Court declines to adopt this test.  Rather, this Court chooses to interpret the AMC exception's incorporation of the Anti-Kickback law's provisions so as not to effectively countermand the broader purpose of the AMC exception itself.  *Cf. Rogan* 459 F. Supp. 2d at 713 n.10 (refusing to interpret the Stark law in a manner "contrary to the manifest purpose of the statute").  In particular, the Court finds instructive the approach of *Feldstein v. Nash Cmty. Health Servs., Inc.*, in which a district court was confronted with an apparent conflict between what the Stark law permitted via an exception and what the Anti-Kickback law seemed to prohibit.  In reconciling the two, the court "decline[d] defendants' invitation to issue a ruling so broad that it would render almost every [one of a type of arrangement seemingly permitted by the Stark law] illegal."  51 F. Supp. 2d 673, 686–88 (E.D.N.C. 1999).  Doing so "would set

---

[20]   One district court in the Sixth Circuit voiced support for the "one purpose" approach, but did so in response to very different facts than those here.  *Neufeld*, 908 F. Supp. at 497.

dangerous precedent," the court believed, since any of the arrangements clearly contemplated by the Stark law exception would run afoul of such a broad interpretation of the Anti-Kickback law. *Id.* at 688.[21]

Here Plaintiffs have included only an extremely general allegation in their complaint regarding a violation of the Anti-Kickback law,[22] and have alleged no specific facts to support it. Thus, the Court is left with Defendants' sworn assertions that no improper intent was behind Kosair's payments to the Research Foundation, as well as Defendants' observation regarding the illogic of the suggestion that the only full-service children's hospital in Kentucky would need to induce referrals through kickbacks to physicians. On the facts before it, the Court finds that Defendants have sufficiently demonstrated that their arrangement does not violate the Anti-Kickback statute, thus satisfying the final requirement of the AMC exception.

## IV.

In Section III of this Memorandum, the Court concludes that Defendants have satisfied the specific elements of the AMC exception to the Stark law. As a result, Plaintiffs' FCA claim cannot proceed. A few other more observations may provide a broader perspective on this result.

The relevant statutory and regulatory text, as well as the relatively few available sources of interpretive guidance on that text, demonstrate that HCFA and CMS were well aware of the sort of arrangements the AMC exception would allow: those involving "frequent referrals and

---

[21]The *Feldstein* court was considering a statutory exception, 42 U.S.C. § 1395nn(e)(5), to the Stark law, rather than a regulatory exception such as that for AMCs. However the Court believes that the *Feldstein* court's logic on this issue applies to the potential conflict between the AMC exception and the Anti-Kickback law as well.

[22]"Defendants also committed acts described in paragraphs (1) or (2) of 42 U.S.C. 1320a-7b(b)." Complaint at ¶ 214.

monetary transfers . . . [that] raise the possibility of indirect remuneration for referrals." Phase I at 916.  Since Phase I, HCFA and CMS have stated that Congress intended to permit the "complex organizational arrangements" that so often are a hallmark of AMCs so long as those arrangements pose little risk of fraud or abuse. *Id.* at 915–16.  Furthermore, throughout the life of the AMC exception, the rulemakers have often responded to actual or potential regulatory overbreadth by paring back the regulatory structure so as to be "cautious in interpreting [the rule's] reach so broadly as to prohibit potentially beneficial financial arrangements." *Id.* at 860.

Thus throughout its analysis the Court has been mindful of the rulemakers' evident desire that the AMC exception be interpreted and applied using a goal- and purpose-oriented perspective rather than a hyper-technical one, and the Court has attempted to do just that. Simply put, the rulemakers recognize the important relationships between physicians, hospitals, and medical instruction.  They want to create space within which true AMCs can operate without interference from the Stark law.  The Stark regulations are attempting to prohibit only those outlier arrangements that are nothing more than illegal referral schemes.

Defendants' evidence proves that their arrangement is not such an outlier arrangement, but rather the sort which the AMC exception was created to protect.  The Court has found a few examples of arrangements which the AMC exception's requirements are intended to "weed out." These have included the University of Medicine and Dentistry of New Jersey (UMDNJ), where "[t]o boost patient volume, UMDNJ hired community cardiologists as part-time 'clinical associate professors' at salaries close to those of its full-time cardiology faculty members, although the part-timers performed minimal or no services for the university." *Kickbacks: U.S. Monitor Alleges Illegal Patient Referral Scheme at N.J. Medical School*, Medicare Rep. (BNA)

No. 17, at 1421 (November 17, 2006).  Similarly, it was alleged in Ohio that payments for referrals by physicians with financial relationships to a hospital "were concealed as 'salaries and expenses in excess of market value,' loan-like agreements that did not call for repayments and directorship contracts that paid for no-show duties."  *Ohio Hospitals Settle Kickback, Fraud Case, Will Pay $13.8 Million*, Andrews Health Care Fraud Litig. Rep. No. 3, at 8 (September 13, 2006).

The evidence before the Court demonstrates that the arrangement between the Medical School, Kosair, and Defendant doctors is of an entirely different character than those just mentioned, and is precisely the sort of arrangement the AMC exception was intended to permit. *Cf. Kosenske*, 2007 WL 3490537, at *11 (noting that the result it had reached "comports with both the letter *and the spirit* of the Stark Act.  Congress designed the Act to prevent physicians from making referrals solely for personal financial gain.  The present case does not implicate such concerns.") (emphasis added).  Therefore, because Defendants meet the legal requirements of the AMC exception as the Court has interpreted them, there remains no underlying Stark law violation upon which Plaintiffs' FCA claim may proceed.

## V.

What remains for the Court to consider are the alternate grounds upon which various Defendants have attempted to defeat Plaintiffs' FCA claim, as well as some loose ends concerning Plaintiffs' remaining claims.  The Court will consider each in turn.

Defendants argue that the Stark law does not apply to them because the relationship between Defendant doctors and Kosair does not constitute an indirect compensation arrangement.  As noted above, the Stark law states that if a physician has a "financial

relationship" with an entity providing healthcare services, the physician may not make a referral

to that entity and may not make a claim for Medicaid or Medicare reimbursement.

42 U.S.C. § 1395nn(a)(1).  The prohibited financial relationship may be either a direct or an

indirect compensation arrangement.  Here, Plaintiffs have alleged that an indirect compensation

arrangement exists, meaning that:

> (i) Between the referring physician . . . and the entity furnishing [designated
> health services] there exists an unbroken chain of any number (but not fewer than
> one) of persons or entities that have financial relationships (as defined [above])
> between them [];
> (ii) The referring physician . . .  receives aggregate compensation from the person
> or entity in the chain with which the physician . . . has a direct financial
> relationship that varies with, or otherwise reflects, the volume or value of referrals
> or other business generated by the referring physician for the entity furnishing the
> [designated health services;] and
> (iii) The entity furnishing [designated health services] has actual knowledge of, or
> acts in reckless disregard or deliberate ignorance of, the fact that the referring
> physician . . . receives aggregate compensation that varies with, or otherwise
> reflects, the value or volume of referrals or other business generated by the
> referring physician for the entity furnishing the [designated health services].

42 C.F.R. § 411.354(c)(2).  Defendants argue that neither the second nor the third element of this

definition have been established by Plaintiffs.

The Court notes without deciding the issue that due to HCFA's and CMS's statements

that they intend the same interpretation of the volume-or-value standard discussed above[23] to

apply "uniformly to all provisions" of the regulations, Phase I at 877, that Plaintiffs might be

unable to establish the second element of the definition of an indirect compensation arrangement.

If so, Defendants would be entitled to summary judgment based on this argument as well.  But

given the Court's prior findings, the Court finds it unnecessary to make a final ruling on this

---

[23]*See* Section III.B.2

question.

Defendant Larry Cook separately argues that Plaintiffs' FCA claim against him arises entirely out of actions taken in his official capacity as a University of Louisville employee and that therefore he is entitled to immunity from prosecution under the FCA. Plaintiffs dispute Dr. Cook's characterization of *Vt. Agency of Natural Res. v. Stevens*, 529 U.S. 765 (2000), the case upon which Dr. Cook relies in his motion, and also dispute that the actions of Dr. Cook giving rise to Plaintiffs' FCA claim were taken entirely in his official capacity. The Court finds any consideration of Dr. Cook's motion unnecessary as it is rendered moot by the Court's disposition of Plaintiffs' FCA claim as to all Defendants.

Finally, though the issue is not explicitly addressed by the parties, the Court's determination of the issues discussed above also implicates Counts XXIX and XXX of Plaintiffs' complaint, which allege violations of the Anti-Kickback and Stark laws, respectively. These Counts might be subject to two interpretations. First, they might merely be "re-allegations" of the violations underlying Plaintiffs' FCA claim. This interpretation would render them simply redundant, and the Court would interpret them as rising and falling along with Count I. An alternate interpretation of Counts XXIX and XXX is that Plaintiffs do in fact intend to allege "free-standing" violations of the Anti-Kickback and Stark laws outside the context of the FCA.

As discussed in the Court's prior opinion, neither the Anti-Kickback law nor the Stark law provides for a private right of enforcement. *Solinger*, 457 F. Supp. at 754 (citing *Bowen*, 852 F.2d at 255). Nor does the *qui tam* statute, 31 U.S.C. 3730(b), which allows private persons to bring civil claims for violation of the FCA, authorize private persons to bring civil claims for violations of the Anti-Kickback and Stark laws *outside* the context of the FCA. There is no

question that under this second interpretation of Counts XXIX and XXX, Plaintiffs are seeking

to avail themselves of just such a right.  Therefore on either view of the allegations made therein,

Counts XXIX and XXX of Plaintiffs' Complaint cannot proceed.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record